First case is D & L Landfill v. Illinois Pollution Control Board. Counsel for the appellant. You may proceed. Please state your name for the record. Oh, by the way, this case is 5-16-007. Thank you. My name is Patrick Shaw, attorney for D & L Landfill Incorporated. May it please the court, I'm here today on behalf of D & L Landfill Incorporated. D & L Landfill started, like many landfills of its time and class, in the 1960s as an open dump on the outskirts of a small western city. The defining feature of an open dump, because that word is used kind of differently these days, is that it's open. It's often a stretch of bad land that may have been excavated or quarried. Probably chosen for its proximity, being not too close but not too far away from a community. The problem with open dumps in the 1960s, as identified by public health regulations, and the primary concern that drew to the outlawing of open dumps, was that they were open to expose the environment. They create nuisance, fresh crap, pests, rats, rodents, mosquitoes, birds. And the decision was made to outlaw open dumps and to go towards what would be euphemistically called the sanitary landfill. The key feature of the sanitary landfill was it was closed. And that's a transition that was made in the late 60s into the early 70s under the guidance of the Illinois Department of Public Health, primarily through county boards or county public health bodies, as these facilities developed plans and approaches to which would ensure long-term coverage of waste that was not exposed to the environment, intermittent cover, and at the end of every operating day, the active base of this landfill would receive daily cover. Was this landfill in Bond County or Greene County? It's in Greeneville. I think it's Bond County. I think your brief said Greene County, so I was confused. So it is in Greeneville? Yes. Yes, it is in Greeneville, Bond County. In 1970, surrounding the first Earth Day, the Illinois Bioprotection Act was passed, which gave rise to the creation of the Illinois Pollution Control Board, the Illinois Bioprotection Agency, and they would now be the responsible parties for regulating landfills in the state of Illinois. These are somewhat unique administrative bodies compared with other states in that they operate under sort of a separation of powers concept. The board is responsible for passing regulations. The agency is in charge of enforcing those regulations or executing their requirements, and if any disputes arise, the pollution control board is the adjudicatory body that evaluates those disputes. One of the first actions the new pollution control board took after its creation was to basically wholesale adopt the landfill policies of the Illinois Department of Public Health, which are still a priority as the coverage. With some modifications, but it is important for our perspective that one of the key regulations in this case is that 1973 regulation of the board, which posts the requirement that after a landfill is closed shop, that it is covered finally, and it is monitored for a period of three years. During that period of time, if anything comes up that endangers that coverage, a cap, remedial action should be taken to maintain that cap. That's essentially the, you know, more years have been added and other things, but that's essentially the type of regulatory focus that these types of facilities have. This is an upgrade from the open dump, but it is not anywhere near what we'll see in the modern landfill, which is a hermetically sealed entity. The primary issues with landfills, from an environmental policy standpoint, has always been the issue that they have a life cycle in which they make money at one point in time, accepting waste, but once they close, they make no money. There is no revenue available to do any environmental work based upon, you know, operating, based upon the annual revenue streams. So in 1983, the LA General Assembly directed the board to create some regulations to make sure that these minimal post-closure care requirements would, in fact, be done and the landfill wouldn't just close and walk away, leaving the state with the liabilities. And this took a while to get the program together, but essentially the program called for a post-closure, and the closure plan is essentially what it sounds like. Let's make sure you have enough coverage over this landfill so that it can continue in this state without any modification or oversight. We are at a point where this trash is not going anywhere. It's staying there. We need that cover to be maintained theoretically in perpetuity. So that cover needs to be good. It needs to be designed by engineers. Engineers are also expected to do alternative analysis. What if you have to close prematurely? What if you go bankrupt tomorrow? Now you don't have all this waste you're assuming. Maybe you've got to do the cap a little bit different. Give us the cost estimates on that. Give us a plan for them. Give us a worst-case scenario plan. It was based upon these plans that were created by engineers and reviewed and approved by the agency that you develop a closure plan and then the post-closure plan, which involved what the statute or the regulation said, which is monitoring gas, water, and settling for a period of time and dealing with issues like erosion that arise during that post-closure care period where the cap didn't quite work the way we thought it would. Based upon the plan that was approved, the engineers developed cost estimates based upon the construction costs or labor costs at that time. And then these were approved then with landfills required to host some sort of security or insurance. I think most commonly a letter of credit was issued by a bank. Landfills deposited the amount agreed to in a bank letter of credit, guaranteed it would be there. So we had a situation in which the requirement of three years post-closure care was guaranteed or financial assurance was there to pay for that. And of course, as part of the briefing, I pointed out that the LA General Assembly became satisfied with the three years. And on at least two different occasions, once in 1986 and once in 1990, they said post-closure care period should be a longer period of time. With the caveat that a longer period of time than that can be adopted by the board or the US EPA if they wish to. The point that we keep drawing back to in our briefing or our arguments is the board never did that. There was justifiable reason to do that. They eventually went to a decision that these types of old landfills, recovered open dumps, weren't technologically where they wanted to go with the landfills. And they wanted to have what is called hermetically sealed landfill in which there's a liner around it and everything is not expected to go anywhere ever. As opposed to the older landfills where over the course of time there's some breakdown of biodegradation of the materials. And eventually the idea is to just return to state of nature. So, for example, in this case, the first proposal for financial assurance that was approved was for $460,000 in 1992. Probably a lot of that was in the cow, frankly. That was a lot. That's a lot of earth moving, a lot of activity. But there also would have been money to set aside for annual costs for paying for the technological ends like lab results for groundwater monitoring. And occasionally we'll go through and throw some, scoop some dirt and shovel it over into a spot that's open dump where you need to put some wrap around something or what may happen. You've got to give an estimate of that. What happens over time is that these financial assumptions are re-evaluated every two years. So, for example, in the $460,000 case, after DNL Landfill had put this final cap on, ideally the final cap should be it. There should be no other work after that. But we know soils have always cooperated with us in a way we would anticipate. But after that work was done, it was... In fact, that's what happened here. Didn't they have to go back? I mean, didn't there be problems with the cap? There was some erosion building, yes. There was some stuff. And I think part of the issue is some landfills have materials in them that are breaking down. And so they're not entirely stable. So you're watching. But erosion is also happening everywhere in the environment. That's kind of the nature of the thing. After you put that final cap on, they're going to go back and say, now our financial assumptions are just the 15 years of post-closure care because we've now done the closure part of it. And at least that they could talk to the agency about that. They got a release of some of the financial requirements. But doesn't 22.17a say or such longer period as may be required by board or federal regulation? Well, I guess what I would say is that that doesn't coordinate with the board's regulations on how they're reviewed every two years and how those assumptions are always upon 15 years. So every two years, what was happening with the financial assurance would be the landfill would have to go in and do a re-estimate. What they would say is, now we only have 13 years to do this. Now we only have 11 years to do this. Well, it's not as simple as getting 1 15th of your money reimbursable because inflation is taking out the other pocket. So the costs are going up. In the per year basis, but the number of years is dropping. So as I think I indicated in the brief, there's now the last in the record, the last financial assurance amount agreed to was $77,000. That was in 2011. That was assuming one year financial insurance was left. So we're down to that point where there's not that much left to do. We're not being told that there's something specific other than the erosion goal, as you mentioned, which we did take care of the satisfaction of the EPA. And that was groundwater. There's groundwater, but there's nothing wrong with the cap. I mean, the groundwater. But that isn't the reason they wanted to not grant the closure certificate was because of the groundwater. Yes, they said that the groundwater contamination levels were too high. When the initial rejection came back, one point was that their erosion goal is identified by the EPA. The other was the concerns about the groundwater contamination or the level of constituents in the groundwater. They went back to the engineer to provide a response. We did a supplemental application. We did satisfy the first one about the erosion issues. As to the other one, what the engineer could say and do is that the ongoing trend, and this is what they're supposed to do. They're supposed to monitor groundwater for 15 years, monitor it, and then any problems that occur in that 15 years abate. They didn't come back and say abate the groundwater or you need to put something else on the cap. They basically have said you're going to monitor groundwater until this stuff is clean enough to drink. That's what they said. That's not the nature of landfills. That is not, I think, the nature of these regulations, which were intended to provide cap that allows sort of a planned abandonment of the property. Because these corporations were built to make money off of something that happened 25, 30 years ago. This class are all kind of like family-owned small businesses. The new landfills, they are multi-state corporations or maybe even international organizations at this point. They exist mainly to sort of, this process is intended to allow planned orderly abandonment of this land so that it doesn't create any problems in the future. Balancing all these issues. I mean, you could take the position that these landfills should be indefinitely monitored. There's no money for that. It was never planned that we would have any money for that. I mean, if that was the plan, the landfills probably would have walked away and took their chances at the outset. The regulations have to have a sort of balance that is practically achievable. The, in the one part of the regulation, which I may have drawn attention, I did draw attention to, I think is ignored, is one of the last steps the landfill goes through is, assuming the certification is approved by the EPA, which has not been approved here, a plan is filed with the recorder's office to make sure that the landfills are monitored. The historic use of that property is known to subsequent owners. It's in the chain of title. And I don't like to make out large cases for, against my potential clients. But when, in all the landfills that have gone through this process and they're having issues that come up, there have been methane, I've been involved in cases involving methane light lighting and doing some damage to corn. It wasn't like, you know, it wasn't very serious. The landfills are not usually, people aren't putting their country houses right next to them. But they, the issues in that case were resolved by traditional restatement of torts concepts. It's an artificial condition on the property, much like maybe an abandoned mine or something else that was done on the property. The property owners, and subsequent property owners, have some sort of reasonable obligations of things that they know, they have notice of, and they can do something about. And that's kind of how those issues work out. That last section is kind of how I read that. That's the purpose of my section. What? What's the last section? 807.318C. And I think that because we haven't gotten to that, I'm not sure we've cited it as often, as we should. We focused on A, which talks about the monitoring requirements, and B, which talks about the remedial action. Again, we have not been asked to conduct a remedial action other than that initial one was taken care of. They're only asking to continue to water monitoring, is that correct? They're asking us to continue to water, monitor groundwater and that kind of thing. And again, the main argument or main point that we're seeking to persuade this Court is that the statute says 15 years means 15 years. And 15 years is 15 years. And the specific language in that statute says, are such other times as the Board may, such other period, longer period, as the Board may set. And there is no such longer period. There is a period in the statute, in the regulations, and it's three years. The Board could have gone to, gone to its regulation and said 17 years, 20 years, it could have changed the period. There's a provision in the regs to simply deal with the period. And they didn't update it. And we make sure this is a process suggesting the Board's not being responsible or whatever. I'm being dismal with the issues here. They took over this barrier from the LA Department of Public Health in the early 70s and basically decided they had a larger chamber, a larger number of environmental objectives they wanted to achieve. And they went through many rulemakings that never resulted in rules. They would try to balance a lot of issues. It was very complicated rulemaking. And they were focused on doing that and issuing questions about what would we do about the old facilities, grandfather clauses or not. But eventually they came to the decision in the early 90s, the old facilities, you're done. We'll give you a couple years to get some money together to close up, but you cannot continue. I represented a number of those landfills back then. They probably saw this as a deal. We get out under the old regs, the old rules. We get out now. But I call it back more closely at the regs now. I think the EPA's, I'm sorry, the Board's position was you guys are so far away from where we think landfills need to be operating at this point. You can't, we can't do anything with you. Close under your own plan. We'll get closure. That's it. You follow your plan. Our clients follow the plan. They've done everything in their plan. But these regulations that have been, that have come up subsequently to their closure plan are being used to say you're not meeting some standard. I mean, if that is a standard that ongoing regulations or new regulations keep this open indefinitely without the period itself actually ever being extended, it is an indefinite period. There's actually, if that's the rule, if that's the reason, there was actually no reason for the legislature to pass any regulation or change to that regulation. I mean, if it's indefinite, it's indefinite. The legislative concerns were not well placed. I think that, I think. Thank you, Counselor. You'll have an opportunity to reply. Sorry, thank you. Counsel for the appellee. Thank you, Your Honor. May it please the Court. My name is Gerald Schmidt. I'm an Assistant Attorney General and I represent the Pollution Control Board and Environmental Protection Agency, which asked for affirmance of the Board's decision in this case. And the main issue here is the proper interpretation of Section 22.17a and the relevant language is that the owner and operator of a landfill shall monitor gas, water, and settling at site for a period of 15 years after the site is completed or closed, or such longer period as may be required by a Board or federal regulation. And what the Board concluded here is that there was a Board regulation that required a longer period in this case. And that's the regulation of 35 Illinois Administrative Code, Section 807.524c. And the reason that required a longer period is here is it only allows the Environmental Protection Agency to certify that post-closure care has ended if it determines that the site will cause future violations of the Act or Part 807 of the regulations. And, of course, the agency and the Board here determined that it would cause future violations. So, in other words, our position is the Board didn't have to come up with a regulation that said 20 years or that set a different period for every case. That a regulation like Section 807.524 might apply in individual cases to block closure for an indefinite period until there's compliance with the Board's regulations. Um, this interpretation, I think, is supported by the language of the statute, but also, you know, by, I think it's also important to note that courts have said the Environmental Protection Act should be construed liberally to advance its purposes of protecting and protecting land in Illinois. And the Board's construction does that. We think D&L's construction does not because, in this case, it would allow the closure to take place and D&L to walk away from its obligations while there are still violations on the property. And, of course, the Board and the agency, they're the agencies that work with this regulation on a day-to-day basis. So, it's also appropriate to give them at least some deference in interpreting the Act and their, you know, the Board's own regulation. Counsel, opposing counsel, stated the concern that this would go on indefinitely, and that that was, uh, appeared to be, you know, against the purpose of the Act. I don't think that is against the purpose of the Act if problems remain there. But I will state something as a practical matter that a company in their position could do in a situation where violations occur, but let's say they're violations that are not especially harmful to the environment, and it would be incredibly costly, let's say, to fix them. There is a procedure called the Adjusted Standard Procedure that's set out in Section 28.1 of the Act, Rule 15, ILCS 28.1. And what it does is allow a company, in effect, to obtain an exemption from a Board regulation if it can make a certain showing, and part of that would be to show it wouldn't be too harmful to the environment. And the Board can place conditions on Adjusted Standard, but that would be one way for a company to potentially get out of a situation where they might face very costly measures and that would not be essential to protect the environment. I'm not saying DNL would get an Adjusted Standard here, but it is a possibility for some companies in this situation. Well, Counsel, you suggested some deference that we should apply, but isn't this de novo review? Thank you, Your Honor. But we've cited some case law in our brief that even when the review is de novo, in a situation involving administrative agencies, the courts do give some deference to the interpretation of the Act that they administer. However, if it were a situation where this Court determined the plain language of the statute or the fine language of the regulations didn't support the opposite of what we're arguing, then this Court would, of course, rule against us. The plain language would absolutely govern in that situation. So some, although it is a de novo standard review, courts have said that some deference is appropriate because the agencies bring some expertise to bear, some expertise to the table. Please give us some reply to Counsel's argument about the groundwater, because that's the only issue that I understand is the continuing concern. Is that correct? That's correct, Your Honor. Okay. Counsel said that the only thing that you are doing is requiring them to continue to monitor until it's clean enough to drink. Is that a correct statement that Counsel made? Would you agree or disagree with that? I would agree to a point and disagree. Right now, in this process, the only problem mentioned was the groundwater, and in this process, the only action suggested was continued monitoring. There would be the possibility of some sort of enforcement action, which is a different process, because they are in violation of the Act. So I don't want to foreclose that possibility that the agency has not chosen to do. In the briefs, it seems to be not disputed that the appellant has stated that the groundwater continues to improve. Is that correct? I believe that's true, Your Honor. Yes. So what reason is there to keep it monitored as it continues to improve? I think really to make sure that that continues, and the hope is that it will continue. But there are situations, I think especially in old landfills, where items in a landfill and substances can shift, and new materials can find their way into groundwater. I'm not saying that's likely to happen here. When was this landfill closed and last used as a landfill? It would have been in the 1990s, and I agree. I think that makes this less likely, but not necessarily impossible. And so that's why we want them to at least continue monitoring, and it's to make sure that the improvement continues, and hopefully to a point where they'll be compliant with the Act. And another thing I would point out, I think at one point in their opening brief, DNL suggests that Part 620, the groundwater regulations, don't apply to that. They apply to everybody. They apply beyond landfills. They really apply to everybody in the state. So Part 620 is the length that groundwater regulations do apply here in this case, and in this situation. And I believe I've pretty much said everything that I intended to say, just to wrap up very quickly. We think the Board's position, its interpretation of Section 22.17a is consistent with the language. We've argued that the plain language of the Act supports the Board's interpretation. But even if you disagree with that, even if there's some ambiguity as to whether the Board would have to put a regulation in saying there would be a longer period in every case, or whether a regulation like Section 807.524c could require longer periods in compliance with the Act and the Board's regulations, even if that ambiguity is there, the Board and agency ask this Court to resolve it in a manner that's favorable with the liberal construction that's afforded to provisions of the Environmental Protection Act. And I thank this Thank you, Counsel. Great job. Just to reply to some of the points that were discussed. I agree with the first point, and we are here regarding interpretation of Section 22.17 of the Act. And while I kind of went along with the regulation because of the unique history of that section, it does fall within the general parameters of trying to figure out what the legislature intended when it passed that. And the chief problem with the interpretation being offered for a longer term is that there was no reason to pass that section. Because when Section 22.17 was passed, the regulations existed then, party of several of the same that existed then. Well, it wouldn't make sense if you were saying to a prospective landfill developer that it's now changed from a minimum of three years of monitoring to a minimum of 15. Well, I guess I think that the General Assembly comes in with a, looking at regulations that have a three-year period, and the common understanding that I think the General Assembly would have had is it's a three-year period. We want a five-year period. The original statute, did it also say, or such longer period? Yeah. I'm sorry, three years was the regulations. The three years was the regulation. When the General Assembly first came into it, it said five-year or such longer period. Okay. And I put emphasis on period. I think that term has some specific meaning in terms of having, that they're looking at that regulation that says three-year period, and don't want to handcuff the pollution control board with its expertise of setting a longer period. But the point is, is that there's some general indefiniteness existing in Part 807 that exists at that time. There was really no reason for the L.A. General Assembly to pass that. Is there any case that you can give to us that, I don't think you have in your brief, so there doesn't appear to be any case that says that it is a definite period of 15 years? Yeah. I mean, really the only case I think that gets into the post-closure care issues is the Jersey Sanitation case. And it doesn't really, it's at the front end of the process. They do repeat the way, they do describe the period as I would, as a definite period. They basically say Jersey Sanitation has a 15-year post-closure care obligation. But the argument that one would make is that they weren't really dealing with, they weren't, that was, you know, 15 years ago. They're not dealing with the issue on this point. But everybody that I think that looks at this, the General Assembly, the pollution control board, back when these regulations were in place, thought this was three years, and it was important to make it five years, that's why it was changed. It was important to make it 15 years, or such a period as the board wants to. I think that, otherwise they wouldn't have, I think they either would not have, 22.17 would not have been passed, or alternatively they wouldn't have used that word period. I mean, they could have just said minimum five years, and then just left it at that. But they specifically said, well, contemplated rulemaking regarding the period, and they're not, he's not, they're not identifying any rulemaking, not just by pollution control board, but the USCPA as well. About this time the USCPA started to get interested in, maybe it needs to be exercising more regulations out there that eventually do get passed, and our client told us to avoid them. I'd also just like to take issue that this is a necessarily bad environmental outcome we're suggesting. When the engineer certified that no future violations of this act will evolve, the plan has been performed, he also indicated that we're going to do these number of things to aid the transition. So at that time there were sort of some passive landfill gas flares operating the site. We're going to move away from this, but we're going to permanently cap this. So that, you know, landfill gas has been declining over time, it's not really serving any purpose. Part of our plan to get this certified as post-closure completed is that we're going to close some of these holes in the cap that are being used to monitor it. Now you already have a choice. Are you going to assume that indefinitely without any revenue, landfills are going to do that out of the goodness of their heart, or are they going to walk away? There's, there are negative environmental consequences from not understanding the environmental, the economical limitations of someone who's not, sorry. Thank you. Thank you, counsel. I think we'll take this matter under advisement and issue a decision in due course.